IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:10-CV-226-D

GLENN DEXTER, KATHRYN )
DEXTER, ROBERT REDENBACH, )
and ROBIN REDENBACH, )
)
                Plaintiffs, )
)
v. )      **ORDER**
)
LAKE CREEK CORPORATION, )
LAKE BAY EAST, LLC, )
CLEAR WATER MARKETING, LLC, )
and D. STEPHEN JONES, SR., )
)
                Defendants. )

On November 3, 2010, Glenn and Kathryn Dexter ("the Dexters") and Robert and Robin Redenbach ("the Redenbachs") (collectively "plaintiffs") filed a complaint [D.E. 1] in which they allege that Lake Creek Corporation ("Lake Creek"), Lake Bay East, LLC ("Lake Bay East"), Clear Water Marketing, LLC ("Clear Water"), and D. Stephen Jones, Sr. ("Jones, Sr.") (collectively "defendants") violated the Interstate Land Sales Full Disclosure Act ("ILSFDA"), 15 U.S.C. §§ 1701–1720, defrauded them, made negligent misrepresentations, violated the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1, and committed a breach of warranty. Plaintiffs seek rescission of the sales contract and damages. Compl. [D.E. 1] 24.

On October 1, 2012, defendants (other than Clear Water)[1] moved for summary judgment

---

[1] On March 10, 2011, the court entered default against Clear Water [D.E. 22].

[D.E. 37] and filed a supporting memorandum and exhibits [D.E. 38–39]. Plaintiffs moved for summary judgment [D.E. 40] on the same day and filed a supporting memorandum and exhibits [D.E. 41]. On November 2, 2012, defendants responded in opposition to plaintiffs' motion [D.E. 47]. On November 4, 2012, plaintiffs responded in opposition to defendants' motion [D.E. 49]. Defendants replied on November 16, 2012 [D.E. 50]. Plaintiffs also moved to amend the complaint [D.E. 34], and defendants responded in opposition [D.E. 36]. As explained below, the court grants in part and denies in part defendants' motion for summary judgment, denies plaintiffs' motion for summary judgment, and denies plaintiffs' motion to amend the complaint.

I.

This court reviews the parties' cross-motions for summary judgment under the familiar standard of Rule 56. In considering the motions, the court views the evidence in the light most favorable to the nonmoving party. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48. The party seeking summary judgment must initially come forward and demonstrate an absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 325. Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 586–87. This same standard applies to cross-motions for summary judgment, and each party's motion is analyzed individually to determine whether summary judgment should be granted. See Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

The court first considers defendants' motion for summary judgment, and the court recites the facts in the light most favorable to the plaintiffs. The Dexters and the Redenbachs are two married couples who hoped to retire next door to each other. Kathryn Dexter Dep. [D.E. 41-7] 46, 59. The Dexters live in Holly Springs, North Carolina, while the Redenbachs live in Buffalo, New York. Glenn Dexter Dep. [D.E. 41-5, 41-6] 10, 84. On April 30, 2005, Kathryn Dexter attended an open house sales event at Bay Tree Lake, a housing development in Bladen County, North Carolina. Compl. ¶ 3; Answer [D.E. 17] ¶ 1; Pls.' Mem. Opp. Mot. Summ. J. [D.E. 49] 2; Kathryn Dexter Dep. 22, 30, 45; Glenn Dexter Dep. 24–25. The Dexters were interested in the development on East Island, which was billed as having the "best lots in the Bay Trees Subdivision." Glenn Dexter Dep. 19–20. At that time, the Dexters already owned a lot located in a different part of the development. Id.

At the event, Karen Coker ("Coker"), a Clear Water real estate agent, was assigned to work with Kathryn Dexter. Kathryn Dexter Dep. 22; Karen Foster Aff. [D.E. 41-11] ¶¶ 4, 12.[2] Coker took Kathryn Dexter to see the development on East Island, and showed her where canals would be dredged, where a marina would be built, where a park would be created on the island, and where direct access would be built from the canals into nearby Horsepen Lake and Bay Tree Lake. Kathryn Dexter Dep. 23–24, 26–27. Although these amenities were not complete, and the inaptly-named "island" was still connected to land, construction equipment was present and work was being done on the canals and marina. Id. 24, 26, 29. Kathryn Dexter also received documents stating that a golf course would be built in the development. Id. 45–46.

---

[2] Karen Foster went by the name Karen Coker during all times relevant to this lawsuit. See Karen Foster Aff. ¶ 1.

3

The sales event was high energy, and Clear Water created a "sense of urgency to purchase lots" among the crowds of people by ringing a bell and "shout[ing] out the number of the lots being sold." Karen Foster Aff. ¶ 9. Kathryn Dexter felt pressured to reserve a lot because "the lots were going fast . . . they were marking them off." Kathryn Dexter Dep. 45.

On April 30, 2005, Kathryn Dexter and Coker signed a Reservation Agreement for lot 912 and Kathryn paid a deposit of $9,157.77. Kathryn Dexter Dep. 30; Dexter Reservation Agreement [D.E. 41-14] 1. Kathryn Dexter also informed Coker that she wanted to be able to sign a Reservation Agreement on behalf of the Redenbachs, and Coker replied that she would need to get management approval. Kathryn Dexter Dep. 93.

Kathryn Dexter spoke with the Redenbachs on April 30, 2005, and relayed how "East Island . . . was going to be a great thing" including direct access to the lakes via canal, a marina, a park, and a nearby golf course, and the Dexters and Redenbachs could buy lots next to each other. Kathryn Dexter Dep. 45–46; Robin Redenbach Dep. [D.E. 41-9] 10. The Redenbachs gave her permission to sign a Reservation Agreement and pay the deposit on their behalf to reserve a lot next to the Dexters' lot. Kathryn Dexter Dep. 46; Robin Redenbach Dep. 11.

On May 1, 2005, Kathryn and Glenn Dexter visited East Island together. Kathryn Dexter Dep. 30–31. Coker showed them the property and again discussed the development and its amenities. Id. 31. Glenn Dexter added his signature to the Reservation Agreement. Id. Coker also informed the Dexters that management had approved Kathryn to sign on behalf of the Redenbachs. Id. 93–94. Coker and at least one Clear Water manager were aware that the Dexters relayed information regarding East Island and Bay Tree Lakes to the Redenbachs. Id. On May 1, 2005, Kathryn Dexter executed a Reservation Agreement to reserve lot 911 for the Redenbachs. Id.;

4

Redenbach Reservation Agreement [D.E. 41-13].

Before the Dexters or the Redenbachs finalized any sales contracts, defendants promised that their East Island lots would feature the following amenities: location on an island connected to land only by bridges beneath which boats could pass, direct access to both Horsepen Lake and Bay Tree Lake via canal, a park in the middle of the island, a nearby golf course, and a marina. Karen Foster Aff. ¶¶ 7, 10; Kathryn Dexter Dep. 24, 56–57, 66, 85, 90; Glenn Dexter Dep. 27–29; Robin Redenbach Dep. 10; Robert Redenbach Dep. [D.E. 41-8] 22, 48. Moreover, defendants promised that most of these amenities would be completed or at least under construction within a few months of June 2005. Kathryn Dexter Dep. 61, 67–69; Glenn Dexter Dep. 27, 41; Karen Foster Aff. ¶ 10; Pls.' Mem. Supp. Mot. Summ. J. [D.E. 41] 4.

In late June 2005, both the Dexters and the Redenbachs closed on the purchase of their respective lots and received general warranty deeds that were recorded. Compl. ¶¶ 72–73. The closing took place entirely by mail. Id. ¶ 68; see Glenn Dexter Dep. 71–75. According to plaintiffs, the documents provided at the closing failed to comply with various requirements of the ILSFDA, including that the developer file a statement of record with the Department of Housing and Urban Development ("HUD") and provide a property report to the purchaser, and that the contract for sale contain provisions informing the purchasers of their rights under the ILSFDA. Compl. ¶¶ 93–96.

Three months after closing, plaintiffs asked Coker if the canals or other amenities had been completed, and Coker responded that they had not and that it would take a few more months. See Karen Foster Aff. ¶ 13; Compl. ¶¶ 74–75. The Dexters and the Redenbachs visited the property in May 2006 and saw that the canals and other amenities were incomplete. Glenn Dexter Aff. 85; Robert Redenbach Aff. 53. Kathryn Dexter continued to inquire about the status of the canals with Coker during 2006 and 2007, but was told each time that the work was not complete but would be

5

in a few months. Compl. ¶ 76; Kathryn Dexter Dep. 69–70; Karen Foster Aff. ¶ 14. In April 2007, defendants issued a memorandum to Bay Tree Lakes property owners, stating that construction delays were the result of noncompliance with erosion control regulations, but that defendants were "quickly catching up" and "the canal system is nearing completion and is expected to be in operation within the next sixty days." [D.E. 41-19]. "Based on these affirmative promises and representations ... the [p]laintiffs refrained from inquiring further for a brief period of time into the failure to open the canals." Compl. ¶ 78.

Unbeknownst to plaintiffs, Mark and Christine McMichael, a couple who also owned property in Bay Tree Lakes, sued Lake Bay East and Lake Creek in July 2005, claiming that the dredging and filling of canals was flooding their property. White Aff. [D.E. 41-12] ¶¶ 3–6. The resulting June 2006 settlement required the establishment of a maximum water level that effectively prevented defendants from opening or filling the canals around East Island. Id. ¶ 7. Defendants never disclosed this lawsuit (the "McMichael suit") or the ensuing settlement to plaintiffs. Compl. ¶ 52.

In September 2008, with the help of real estate agent Brian Walsh ("Walsh"), the Dexters listed their lot for sale. Kathryn Dexter Dep. 95–96; Walsh Aff. [D.E. 41-10] ¶ 4. Walsh spoke with defendants about the status of the canals several times during 2008 and 2009, and was told each time that the canals would be completed and opened "within three months." Walsh relayed this information to the Dexters. Walsh Aff. ¶¶ 5–6. In March 2009, Glenn Dexter learned from defendants that plaintiffs "should've never been promised a golf course." Glenn Dexter Dep. 114. In November 2009, Walsh again inquired about the canals and was told that the canals would be opened soon. Walsh Aff. ¶ 7. Walsh also learned that the defendants would not promise to open the canals by any certain date unless "the Dexters had a buyer" and the opening of the canals "was

6

a deal-breaker." Id.

According to plaintiffs, they were not aware that defendants' representations regarding the canals were fraudulent until late 2009, were not aware of defendants' failure to disclose the McMichael suit until early 2010, and were not aware of defendants' violations of the ILSFDA until 2010. Pls.' Mem. Opp. Mot. Summ. J. [D.E. 49] 8–9.

Plaintiffs assert six claims: (1) defendants violated the ILSFDA by failing to file a Statement of Record with HUD, 15 U.S.C. § 1703(a)(1)(A), failing to provide a HUD property report to plaintiffs, 15 U.S.C. § 1703(a)(1)(B), and failing to include a provision in the contract for sale notifying plaintiffs of their option to revoke their purchases, 15 U.S.C. § 1703(c); (2) defendants violated 15 U.S.C. § 1703(a)(2)(A)–(D) by employing a scheme to defraud plaintiffs, obtaining money by omitting to state a material fact, engaging in a course of business which operated as a fraud on the plaintiffs, and failing to include completion of amenities in the sales contract after representing that the amenities would be completed; (3) breach of warranty including breach of the covenants of seisin and title; (4) fraud; (5) negligent misrepresentation; and (6) UDTPA violations. North Carolina law governs the common law and UDTPA claims.

In seeking summary judgment, defendants initially assert that claims one, two, four, five, and six are time-barred. See Defs.' Mot. Summ. J. [D.E. 37] 1. The court examines each argument seriatim.

As for the alleged violations of 15 U.S.C. § 1703(a)(1)(A), (a)(1)(B), (a)(2)(D), and (c) in claims one and two, such actions are time-barred unless brought within three years after the date that the parties signed the contract of sale. See 15 U.S.C. § 1711(a)(1), (b). Absent equitable tolling, plaintiffs concede these claims were time-barred as of June 2008. See Pls.' Mem. Opp. Mot. Summ. J. 13–14.

7

For equitable tolling to apply, the plaintiffs must show (1) that they "exercised due diligence to discover [their] cause of action prior to the running of the statute" and (2) that the defendants were "guilty of some affirmative act of fraudulent concealment which frustrated discovery notwithstanding such diligence." Lukenas v. Bryce's Mtn. Resort, Inc., 538 F.2d 594, 597 (4th Cir. 1976) (quotations and parentheses omitted). Plaintiffs were not diligent in discovering these violations, and their inquiries into the status of amenities are irrelevant to these claims. Furthermore, plaintiffs have failed to show any affirmative act by defendants that concealed these alleged ILSFDA violations. Defendants' alleged representations as to completing the canals and other amenities could not have concealed or frustrated discovery of straightforward violations of ILSFDA requirements. Failure to file a HUD property statement, failure to give buyers a property report, and failure to notify buyers of ILSFDA rights "represent merely . . . plain and obvious violation[s] of the statute, [and] offer little or no opportunity for a successful establishment of the tolling." Id. Because equitable tolling does not apply, no genuine issue of material fact exists, and the court grants summary judgment to defendants on claim one and the claim based on section 1703(a)(2)(D) in claim two. See id.

As for the violation of section 1703(a)(2)(A)–(C) alleged in claim two, such claims are time-barred if brought "more than three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 1711(a)(2). Similarly, the state-law fraud allegation in claim four is subject to a three-year statute of limitations, which begins running "when the aggrieved party discovers the facts constituting the fraud, or when, in the exercise of reasonable diligence, such facts should have been discovered." Vail v. Vail, 233 N.C. 109, 116, 63 S.E.2d 202, 207 (1951); see N.C. Gen. Stat. § 1-52(9). Claim five alleges negligent misrepresentation and is subject to a three-year statute of limitations, which begins running upon

8

discovery of the misrepresentation. See N.C. Gen. Stat. § 1-52(5); Barger v. McCoy Hillard & Parks, 346 N.C. 650, 665–66, 488 S.E.2d 215, 224 (1997). Claim six is subject to a four-year statute of limitations, which begins running "at the time the fraud is discovered or should have been discovered with the exercise of reasonable diligence." Nash v. Motorola Commc'ns & Elecs., Inc., 96 N.C. App. 329, 331, 385 S.E.2d 537, 538 (1989) (emphasis removed); see N.C. Gen. Stat. § 75-16.2. In sum, the limitations periods for claims two, four, five, and six began running, at the latest, when the fraud or negligent misrepresentation underlying the claims was discovered or should have been discovered with the exercise of reasonable diligence.

Claims two, four, five, and six are all based on allegations that the plaintiffs would not have purchased lots 911 and 912 in June 2005 if not for certain fraudulent or negligent representations that defendants made—namely, that canals around East Island would be completed within a few months of plaintiffs' purchases, along with direct access to both Horsepen Lake and Bay Tree Lake via canal, a park in the middle of East Island, a nearby golf course, and a marina. Compl. ¶¶ 109, 122, 127, 128, 134, 138, 139, 144–49. In May 2006, both the Dexters and the Redenbachs visited East Island and saw firsthand the incomplete state of the canals and other amenities, nearly eleven months after closing. Glenn Dexter Dep. 85; Robert Redenbach Dep. 49–53. Defendants argue that this visit triggered the limitations period as a matter of law because the plaintiffs necessarily discovered at that time that defendants had not fulfilled their alleged promises to complete any of the various amenities including the canals within a few months of the June 2005 closing. Defs.' Mem. Supp. Mot. Summ. J. 21. Plaintiffs respond that, due to defendants' continued misrepresentations, they did not discover the alleged fraud until the fall of 2009. Pls.' Mem. Opp. Mot. Summ. J. 7.

"Whether a plaintiff has exercised due diligence is ordinarily an issue of fact for the jury absent dispositive or conclusive evidence indicating neglect by the plaintiff as a matter of law."

9

Spears v. Moore, 145 N.C. App. 706, 708, 551 S.E.2d 483, 485 (2001); see Feibus & Co., Inc. v. Godley Constr. Co., 301 N.C. 294, 304–05, 271 S.E.2d 385, 392 (1980). Here, a reasonable jury could determine that a reasonably diligent plaintiff would have inquired further than the plaintiffs did in May 2006, and therefore could have discovered the alleged fraud, omissions, or misrepresentations at that time. On the other hand, a reasonable jury could determine that plaintiffs were reasonably diligent because defendants' repeated assurances that they would complete all amenities prevented plaintiffs from inquiring further to discover any fraud or misrepresentation. See Lee v. Keck, 68 N.C. App. 320, 326–27, 315 S.E.2d 323, 328 (1984) (statute of limitations defense could not be resolved as a matter of law where the defendant developer repeatedly promised to complete development amenities throughout the limitations period). Whether, and for how long, it was reasonable for plaintiffs to rely on defendants' assurances that the amenities would be completed is a genuine issue of material fact as to the statute of limitations defense. Therefore, the court denies defendants' motion for summary judgment on the fraud, misrepresentation, and unfair and deceptive trade practices alleged in claims two, four, five, and six.

Alternatively, defendants argue that the plaintiffs cannot prove all elements of fraud. See Defs.' Mem. Supp. Mot. Summ. J. 19–20. Under North Carolina law, to prove fraud, plaintiffs must show (1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with intent to deceive; (4) which does, in fact, deceive; (5) resulting in damages to the plaintiffs. Vail, 233 N.C. at 113, 63 S.E.2d at 205; Whisnant v. Carolina Farm Credit, 204 N.C. App. 84, 94–95, 693 S.E.2d 149, 156–57 (2010); Phelps-Dickson Builders, LLC v. Amerimann Partners, 172 N.C. App. 427, 437, 617 S.E.2d 664, 670 (2005) (fraud); Harton v. Harton, 81 N.C. App. 295, 298–99, 344 S.E.2d 117, 119–20 (1986) (fraud in inducement). Plaintiffs must show that any reliance on the false representations was reasonable. Forbis v. Neal, 361 N.C. 519, 527, 649

10

S.E.2d 382, 387 (2007); Hudson-Cole Dev. Corp. v. Beemer, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999); Rosenthal v. Perkins, 42 N.C. App. 449, 451–52, 257 S.E.2d 63, 65 (1979). In particular, defendants contend that plaintiffs offer no evidence of intent to deceive and that plaintiffs cannot prove that they were actually misled or deceived.[3]

As to proof of intent, plaintiffs need not present direct evidence because fraudulent intent "usually is not shown by direct evidence but generally is proven by circumstances... [such as] some motive on the part of the perpetrator." Latta v. Rainey, 202 N.C. App. 587, 600, 689 S.E.2d 898, 909 (2010) (quotation omitted). Plaintiffs have produced sufficient admissible evidence for a jury to find that defendants fraudulently or negligently misrepresented the developers' intentions to complete various amenities in order to induce plaintiffs and others to purchase property. See, e.g., Karen Foster Aff. ¶¶ 9–10. As for whether plaintiffs were actually deceived, plaintiffs present evidence that would support a jury finding that they were actually deceived as to defendants' intent to complete the canals and other amenities. See, e.g., Kathryn Dexter Dep. 61. Although defendants argue that plaintiffs could not have been deceived because none of the amenities were complete at the time of closing in June 2005, plaintiffs plausibly contend that they were deceived as to defendants' intent in June 2005 to complete the amenities, not the existence of the amenities themselves.

Alternatively, defendants assert that the Redenbachs cannot prove reliance on statements by

---

[3]Defendants also argue that any misrepresentations made by Coker are inadmissible hearsay, and that plaintiffs therefore have no evidence of any misrepresentation. Defs.' Mem. Supp. Mot. Summ. J. 26–28. Because Coker's statements, and the Dexters' repetition of those statements to the Redenbachs, are not offered for their truth but as verbal acts, they are not hearsay. See Fed. R. Evid. 801(c)(2) & advisory committee's note ("[The rule's] effect is to exclude from hearsay the entire category of 'verbal acts' . . . in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights."); Schindler v. Seiler, 474 F.3d 1008, 1010–11 (7th Cir. 2007).

11

any defendant because the Redenbachs received all of the allegedly fraudulent statements secondhand through the Dexters. See Defs.' Mem. Supp. Mot. Summ. J. 24–26. Viewing the evidence in the light most favorable to plaintiffs, the evidence shows that defendants were aware that the Dexters were acting as agents for the Redenbachs, that the Dexters accurately relayed the defendants' alleged fraudulent statements to the Redenbachs, and that the Redenbachs would not have purchased any property but for the alleged misrepresentations. Kathryn Dexter Dep. 93–94; Karen Foster Aff. ¶ 12; Robert Redenbach Dep. 21–22, 28–29, 31–32, 61–65. Viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could find that the Redenbachs relied on defendants' misrepresentations that the Dexters (who were acting as their agents) relayed. See Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co., 332 N.C. 1, 21, 418 S.E.2d 648, 661 (1992); cf. Restatement (Second) of Agency § 315 (1958). Accordingly, the court denies defendants' motion for summary judgment on the fraud and negligent misrepresentation claims in counts two, four, five, and six.

Finally, as to claim three, defendants argue that plaintiffs cannot prove the essential elements of breach of warranty. Defs.' Mem. Supp. Mot. Summ. J. 28–29. In the complaint, plaintiffs allege that the defendants "breached the Covenants of Seisin and Title by failing to provide access to" the canals and lakes near the property. Compl. ¶ 117.

"A covenant of seisin in a general warranty deed is a covenant that the grantor has title to the land conveyed at the time the deed is delivered and the covenant is breached upon delivery if the grantor does not then have title." Riddle v. Nelson, 84 N.C. App. 656, 658–59, 353 S.E.2d 866, 868 (1987). Plaintiffs admit that defendants held title to the land conveyed. See Pls.' Mem. Opp. Mot. Dismiss [D.E. 25] 14. Therefore, plaintiffs cannot prove any breach of the covenant of seisin, and the court grants summary judgment to the defendants as to the claim for breach of covenant of seisin

12

or title.

Plaintiffs also argue that their claim for breach of warranty in claim three includes a claim for breach of an implied warranty for access to the canals. Pls.' Mem. Supp. Mot. Summ. J. 27; see Pls.' Mem. Opp. Mot. Dismiss 13–14. In Hinson v. Jefferson, the Supreme Court of North Carolina recognized a cause of action for breach of an implied warranty based on restrictive covenants contained in a deed. 287 N.C. 422, 433–36, 215 S.E.2d 102, 109–11 (1975). Here, however, plaintiffs' claim for breach of implied warranty fails for two reasons. First, the implied warranty described in Hinson is a warranty that land that is restricted to residential use is fit for such use. Id. at 435, 215 S.E.2d at 111. Plaintiffs, however, present no evidence that the land they purchased is restricted to a use for which it is unfit. Second, the implied warranty exists only where the property's unfitness for a particular use was "unknown to and not reasonably discoverable by the grantee before or at the time of conveyance." Id., 215 S.E.2d at 111. Here, plaintiffs knew that the canals and other amenities were incomplete when they purchased the properties on East Island, and so no implied warranty exists.[4]

Alternatively, defendants plead the three-year statute of limitations as a defense. Answer 10. Plaintiffs respond that their claims for breach of warranty are subject to a ten-year limitations period. Pls.' Mem. Supp. Mot. Summ. J. 30. The implied warranty recognized in Hinson is a contract right based on the sales contract, not the deed. See Hinson, 287 N.C. at 433–36, 215 S.E.2d at 109–11. Claims for breach of contract are subject to a three-year statute of limitations, N.C. Gen. Stat.

---

[4]Plaintiffs also argue that they have stated a claim for breach of "warranty of easement" for waterway access and enjoyment. Pls.' Mem. Supp. Mot. Summ. J. 30. Plaintiffs, however, cite no cases to support such a cause of action, and this court has not located any North Carolina cases to support such a cause of action. Moreover, this court cannot expand North Carolina common law to create such a cause of action. See, e.g., Ellis v. La.-Pac. Corp., 699 F.3d 778, 787 n.5 (4th Cir. 2012). Thus, the claim fails.

13

§ 1-52(1), which begins running when the breach occurs. Munie v. Tangle Oaks Corp., 109 N.C. App. 336, 341, 427 S.E.2d 149, 152 (1993). Here, any breach of implied warranty accrued upon executing the sales contract in June 2005 because the canals were not complete at that time. Thus, any claim for breach of an implied warranty lapsed in June 2008, but plaintiffs did not file suit until November 3, 2010. Accordingly, the court grants defendants summary judgment as to any claim for breach of implied warranty.

II.

Next, the court considers the plaintiffs' motion for summary judgment. Plaintiffs seek summary judgment on claims one, two, and three. For the reasons stated above, plaintiffs' motion is denied as to claim one, the claim based on section 1703(a)(2)(D) alleged in claim two, and claim three.

As for the alleged violations of 15 U.S.C. § 1703(a)(2)(A)–(C) in claim two, plaintiffs' claims hinge on their allegations that defendants either knew that they could not or would not provide the promised amenities, that defendants made those promises without exercising due diligence to ensure that the amenities could be completed, that defendants knew they had not complied with the requirements of the ILSFDA, and that defendants knew that the McMichael suit would render defendants unable to complete the canals as promised. See Pls.' Mem. Supp. Mot. Summ. J. 22–27. But as defendants note, they have produced evidence contradicting each of those allegations. Defs.' Mem. Opp. Summ. J. [D.E. 47] 24–26. Specifically, defendants offer testimony that they discouraged Coker and other sales agents from making promises about amenities or otherwise misrepresenting the availability of amenities. Barwick Dep. [D.E. 41-2] 68–69. Defendants also have presented evidence from which a reasonable jury could conclude that the defendants intended to complete the canals and lake access when the promises were made but later

14

encountered unexpectedly difficult problems while attempting to do so. E.g., id. 48–52. Furthermore, defendants sought legal counsel and were advised that they were exempt from the ILSFDA reporting requirements. See Jones, Jr. Dep. [D.E. 41-4] 54–57. Finally, although plaintiffs assert that defendants failed to disclose the McMichael suit to the plaintiffs, the North Carolina suit was filed suit one month after plaintiffs closed on lots 911 and 912, and the settlement that prevented defendants from completing the canals was not reached until June 2006. White Aff. ¶ 5, 7. A reasonable jury could conclude that, when plaintiffs closed on the properties, defendants were not aware that the dispute with the McMichaels would impact other property owners.

Viewing the evidence in the light most favorable to defendants, a genuine issue of material fact exists concerning whether defendants' actions constitute a scheme to defraud, whether defendants obtained money from plaintiffs by omitting to state a material fact, or whether defendants engaged in a course of business that operated a fraud or deceit on the plaintiffs. See 15 U.S.C. 1703(a)(2)(A)–(C). Therefore, plaintiffs' motion for summary judgment on claim two is denied.

### III.

Next, the court considers plaintiffs' motion to amend the complaint [D.E. 34]. The amended complaint is substantially identical to the original complaint except that it adds D. Stephen Jones, Jr. ("Jones, Jr.") as a defendant. Defendants oppose adding Jones, Jr. as a defendant [D.E. 36]. Under Rule 15, the court should freely give leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, Rule 15 does not govern the inquiry after the court has entered a scheduling order setting out a time for filing amended pleadings. Rather, any amendment requires a showing of "good cause" under Rule 16. Fed. R. Civ. P. 16(b)(4); see Nourison Rug Corp. v. Parvizan, 535 F.3d 295, 298–99 (4th Cir. 2008).

15

On August 11, 2011, this court entered a scheduling order [D.E. 28] which required that "motions to join additional parties and to amend pleadings . . . be made promptly after the information giving rise to the motion becomes known" and that "[a]ny such motion filed after December 2, 2011, must meet the standards of Fed. R. Civ. P. 15 and 16." Plaintiffs' motion to amend comes nearly twenty-two months after the original complaint, four months after the close of discovery, and after the deadline for filing dispositive motions. Plaintiffs knew in August 2010 that Jones, Jr. was an officer of the defendant corporations. Reply Mem. Supp. Pls.' Mot. Amend [D.E. 45] 7. Jones, Jr. was deposed on April 26, 2012 [D.E. 41-4], and his testimony "enlightened plaintiffs" as to his role in the acts alleged in this case. Reply Mem. Supp. Pls.' Mot. Amend 10. Inexplicably, plaintiffs waited four months after this enlightenment to move to add Jones, Jr. as a defendant. Plaintiffs have failed to show good cause under Rule 16. See Nourison Rug Corp., 535 F.3d at 298–99. Moreover, adding Jones, Jr. would prejudice defendants and further delay the case. Accordingly, the court denies the motion to amend.

IV.

In sum, the court GRANTS IN PART AND DENIES IN PART defendants' motion for summary judgment [D.E. 37], DENIES plaintiffs' motion for summary judgment [D.E. 40], and DENIES plaintiffs' motion to amend the complaint [D.E. 34]. The parties shall engage in mediation not later than July 2, 2013, and promptly report the results of the mediation upon completion. If the case does not settle at mediation, the court intends to set a trial date promptly.

SO ORDERED. This 7 day of May 2013.

JAMES C. DEVER III
Chief United States District Judge